Philadelphia *v.* Pennsylvania Public Utility Commission, Appellant.

Argued January 10, 1972. Before JONES, C. J., EA-GEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

reargument refused December 18, 1972.

*Alan R. Squires,* Assistant Counsel, with him Edward Munce, Acting Counsel, for Public Utility Commission, appellant.

*Frederic J. Ballard,* with him *Tyson W. Coughlin, James W. Sutton, Edward G. Bauer, Jr., Eugene J. Bradley,* and *Ballard, Spahr, Andrews & Ingersoll,* for Philadelphia Electric Company, intervening appellant.

*John B. King*, with him *Donald F. Clarke*, and *Thomas A. Everly, Jr.*, for The Bell Telephone Company of Pennsylvania, intervening appellant.

*Herbert G. Zahn*, Assistant Attorney General, for Pennsylvania Department of Transportation, appellee.

*John Mattioni*, Deputy City Solicitor, with him *James M. Penny, Jr.*, Assistant City Solicitor, and *Levy Anderson*, City Solicitor, for City of Philadelphia, appellee.

*David P. Bruton*, with him *J. Freedley Hunsicker, Jr., Lewis H. Van Dusen, Jr.*, and *Drinker, Biddle & Reath*, for Southeastern Pennsylvania Transportation Authority.

OPINION BY MR. CHIEF JUSTICE JONES, November 17, 1972:

This appeal involves the question whether the burden of financing the relocation of utility lines and equipment necessitated by the extension of the Broad Street Subway in Philadelphia, must be borne by utility companies (intervening appellants)[1] or whether the expense shall be allocated between the City of Philadelphia and the utility companies in such proportions as determined by the Pennsylvania Public Utility Commission.

The proposed subway extension is intended to expand rapid transit service to the inhabitants of South

---

[1] City and SEPTA appealed to the Superior Court. Bell and Electric were granted leave to intervene as appellees. The Commonwealth's Department of Transportation was granted leave to intervene as appellant. Both appeals were transferred to the Commonwealth Court on October 15, 1970. Bell and Electric are here intervening appellants and the Department of Transportation is now an intervening appellee.

Philadelphia, provide public transportation to the newly constructed sports complex at Broad Street and Pattison Avenue and relieve traffic congestion in the area. The construction requires street crossings over the subway line at fifteen separate locations. Appellees, the City of Philadelphia (City) and the Southeastern Pennsylvania Transportation Authority (SEPTA), filed an application with the Public Utility Commission (Commission) pursuant to the Public Utility Law of 1937, Act of May 28, 1937, P. L. 1053, art. I, §§1 *et seq.*, 66 P.S. §§1101 *et seq.*, for approval of the construction of the above grade crossings. The utility companies which are affected by crossing construction necessitating facility relocation include, among others, the Bell Telephone Company of Pennsylvania (Bell) and the Philadelphia Electric Company (Electric).

The Commission issued a preliminary order on May 5, 1969, temporarily approving the project and directing the utilities to make the necessary relocations at the utilities' expense pending a hearing and final order.

The Commission hearing adduced the following relevant evidence. Exclusive of the cost of relocating the intervening appellants' facilities, the subway construction and grade crossings would cost $33,000,000. The project is to be financed by a self-sustaining bond issue by the City, the debt service of which is to be paid from revenue generated by appellee SEPTA in the operation of the subway pursuant to an agreement between SEPTA and the City. SEPTA will operate the subway extension on its completion. The City has agreed to relocate all City-owned water mains, drainage facilities and transit ducts and to defray as much of the cost of relocation of the facilities of the Philadelphia Gas Works as the City assumed by agreement with the Gas Works dated December 29, 1961. All of these expenses will be defrayed from the proceeds of the City bond issue.

The cost of relocating the utility lines of Bell and Electric was estimated at $19,500 and $448,000, respectively. Appellees City and SEPTA urged the Commission to impose the entire cost of facility relocation on the utility companies. At the Commission hearings, the City disclaimed liability for the costs associated with utility companies' relocations. The City argued that since these utility facilities were implanted pursuant to permits granted by the City,[2] which permits required the utilities to relocate at their own expense when the change in location was necessitated by public project,[3] the terms of these permits should here apply.

The Commission, in its final order dated June 1, 1970, determined that its power to allocate costs in crossing cases was plenary and exclusive, notwithstanding that the permit provisions dictate that relocation expenses should be borne by the utility companies. The Commission directed, in paragraphs 21 and 22 of its order, that the City pay the utility companies 75% of the cost of relocation exclusive of any betterment to their facilities. On appeal by the City and SEPTA, the Commonwealth Court vacated and set aside paragraphs

---

[2] Electric made two applications for permits in 1916, three in 1926, four in 1941 and one each in 1932, 1940, 1942, 1943 and 1945. Bell made two applications for permits each in 1914 and 1945, and one each in 1925 and 1949.

[3] Bell stipulated at the hearings that its facilities, for which it sought reimbursement for relocation costs, were installed pursuant to agreements containing the following provision: "If, in the laying of water or gas pipes, sewers, or any other municipal work, it shall become necessary to change the location of any of the conduits, manholes or other structures, they shall be shifted or altered at the cost or expense of the owners. . . ."

Electric stipulated that its facilities were installed pursuant to agreements containing similar language: ". . . if, in the construction of water or gas mains, sewers, or any other municipal work, it shall become necessary to change the location of any existing privately owned structures occupying the highways, their location shall be changed at the sole expense of the owners. . . ."

21 and 22 of the Commission's order and relieved the City of any duty of reimbursement for the costs incurred by Bell and Electric pursuant to facility relocation.

This Court is asked to decide the questions: (1) whether the Public Utility Commission has statutory authority to allocate the cost of relocating the facilities of Bell and Electric between the City and said utilities in view of the permit agreements imposing the entire cost of relocation on appellants utilities; and (2) whether the Commission exceeded its statutory powers by abrogating the provisions of the permits here involved.[4]

That a valid, binding contractual obligation was created when the utility companies obtained permits for the laying of conduits in the City's streets was decided by this Court in *Philadelphia Electric Company v. Philadelphia,* 301 Pa. 291, 152 Atl. 23 (1930). "The contractual conditions imposed by the City, which [appellants] could either accept or reject, were impositions certainly within the scope of its municipal powers." 301 Pa. at 298, 152 Atl. at 26. Since the permits were granted as part of contractual agreements between the City and the utility companies, there can be no doubt that the covenants of Bell and Electric providing that the cost of facility relocation would be borne by facility owners were part of the *quid pro quo* which the utility companies proffered in exchange for the City's permit grants.

Appellants would have this Court disturb vested contractual rights derived from arm's length bargain-

---

[4] The question whether the Commission acted arbitrarily and capriciously in abuse of its administrative discretion by allocating expenses is also raised. The Court's determination that the Commission's order exceeded its statutory authority makes the question whether the Commission acted in abuse of its administrative discretion unnecessary to reach.

ing which resulted in the permit agreements of the parties, including the intervening appellants, for the purported purpose of effecting Section 411(a) of the Public Utility Law of 1937, as amended, 66 P.S. §1181 (a), which provides in pertinent part: "Such compensation [of adjacent property owners for property taken, injured or destroyed in connection with a crossing], as well as the cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as hereinafter provided by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proportion as the commission may, after due notice and hearing, determine, *unless such proportions are mutually agreed upon and paid by the interested parties.*" (Emphasis added.)

Section 411(a) provides for the compensation of utility owners for the expense necessitated by facility relocation, the amount of such compensation to be borne by the City and the utilities in proportions determined by the Commission *unless* the amounts to be paid are *mutually agreed upon and paid* by the parties. The parties affected by rail-highway construction are thus encouraged to agree among themselves respecting the allocation of relocation expenses. The Commission is unauthorized to allocate costs in the presence of an agreement and payment by the parties.

The appellants contend that the allocation of costs in rail-highway construction is an exercise of the Commission's police power and that the Commission is necessarily injected as a third *party* to any cost allocation agreement. It is thus argued that any agreement reached with respect to the apportionment of relocation expenses without the approval of the Commission is not *mutually agreed upon* by the *parties* within the meaning of Section 411(a).

This position fails first because the Commission's power to abrogate the subject contracts is limited to situations in which such action is compelled by the public health, welfare and safety. *See, Pennsylvania Railroad Co. v. Pennsylvania Public Utility Commission,* 136 Pa. Superior Ct. 1, 7 A. 2d 86 (1939) ; *Director General of Railroads v. West Penn Railways Co.,* 281 Pa. 309, 126 Atl. 767 (1924) ; *Pittsburgh and Lake Erie Railroad Co. v. Public Service Commission,* 75 Pa. Superior Ct. 282 (1920). It cannot be realistically argued that cost reallocation is necessary to enhance public health, safety or welfare.

The view that an agreement of the parties without Commission approval cannot be deemed "mutually agreed upon" for Section 411(a) purposes denies a common sense reading to that provision. We read the provision to mean that the Commission may exercise its jurisdiction to allocate costs only in the absence of an agreement respecting cost apportionment among the parties. There is no agreement lacking here. No public interest is served by permitting the Commission to exercise the authority to allocate costs between the parties when the condition precedent to the exercise of that authority, *i.e.,* the failure of these parties to reach an agreement respecting cost allocation, has not transpired.

Appellants contend that, even if a mutual agreement is here present, "[t]o deprive the commission of jurisdiction in allocating the cost, the proportions must be paid, as well as be agreed upon; that is, the agreement must be actually carried into effect, pursuant to its terms." *Pennsylvania Railroad Co. v. Public Service Commission,* 127 Pa. Superior Ct. 544, 552, 193 Atl. 127, 130 (1937). Appellants would define "paid" in the context of Section 411(a) as pertaining only to payments pursuant to final allocation of costs by the Commission. This interpretation renders the proviso "mutually

agreed upon and paid" meaningless. According to this view, the Commission can always allocate costs as it sees fit, where the parties have agreed upon and paid relocation costs, on the theory that the payment of costs is only initial payment, subject to the Commission's responsibility to make a later independent decision respecting cost allocation. The statutory language promoting private agreements would be thus emasculated.

We hold that the private contractual cost allocation embodied in appellants' permits is both *mutually agreed upon and paid* within the contemplation of Section 411(a) and, therefore, that the Commission was without statutory authority to order the City to reimburse 75% of appellants' cost of facility relocation.

The Commission's order exceeded its statutory authority. The Commission is authorized to allocate the costs of facility relocation in grade crossing cases where the parties havce not *mutually agreed upon and paid* the cost of relocation. The Commission, however, is not authorized to impair pre-existing contractual rights and duties except under limited circumstances. The appellants ask this Court to permit the Commission to abrogate the road occupancy contracts as a legitimate exercise of police power. Unless it appears, however, that these contracts adversely affect the public welfare, the legislature may not interfere with the cost allocation provisions. *Director General of Railroads v. West Penn Railways Co.,* 281 Pa. 309, 126 Atl. 767 (1924). This Court has limited the contract abrogation ambit of the Commission to particular circumstances. The Commission's power to set aside contracts does not apply to a contract which does not affect the common welfare by *directly* influencing rates or actual operations of the public utility. *Pittsburgh and Lake Erie Railroad Co. v. McKees Rocks Borough,* 287 Pa. 311, 135 Atl. 227 (1926). Affirming the permit con-

tracts and their cost allocation provisions does not adversely affect the public welfare. Sustaining the contracts *might* necessitate a utility rate increase to defray the cost of facility relocation. Abrogating the contracts would require the City to bear the most substantial portion of the relocation costs. The additional cost to the City would be defrayed with tax revenue or an additional bond issue. In any case, the cost of facility relocation will finally be borne by the public. The net public detriment of sustaining the permit contracts, therefore, is negligible. Indeed, it is arguable that the concern for public welfare forbids the abrogation of contracts which impose the burden of relocation upon the utility companies: "The refusal to pay for the relocation of utilities . . . is based upon the theory that inasmuch as public utility companies are not required to pay for the use of the highway, the Commonwealth has no obligation to them when it requires them to change their facilities because of changes which the Commonwealth desires to make in the highway. It might also be argued that if the Commonwealth was required to pay the cost of relocating utilities, it would become an element of consideration in each proposed construction, and in some cases the cost of such relocation might stand in the way of highway improvement." *Department of Highways v. Pennsylvania Public Utility Commission,* 185 Pa. Superior Ct. 1, 7, 136 A. 2d 473, 477 (1957).

We will not abrogate vested contractual rights bargained for in an arm's length transaction between the utility companies and the City of Philadelphia. The doctrine of stare decisis would here dictate that contractual rights should abide except under circumstances where public welfare compels a contrary result. "This doctrine [stare decisis] 'is a salutary one and should not be departed from where the decision is of long standing and rights have been acquired under

it, unless considerations of public policy demand it.' " *Colonial Trust Co. v. Flanagan,* 344 Pa. 556, 561, 25 A. 2d 728, 730 (1942). No public policy considerations appear which would justify the Court's departure from the preservation of fundamental contractual rights and obligations.

The order of the Commonwealth Court is affirmed. Paragraphs 21 and 22 of the Commission's order dated June 1, 1970, are vacated and set aside and the City of Philadelphia is relieved of any duty to reimburse the utility companies for the cost of facility relocation necessitated by the Broad Street Subway extension.

Mr. Justice MANDERINO took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

On numerous occasions in the past, this court has recognized that in enacting the Public Utility Code and creating the Public Utility Commission, the legislature sought to eliminate the vagaries and inequities of local utility regulation and to substitute a statewide standardization of all facets of the operation of public utilities, including but not limited to rates, service, installation and safety. *Chester County v. Philadelphia Electric,* 420 Pa. 422, 218 A. 2d 331 (1966); *Einhorn v. Philadelphia Electric,* 410 Pa. 630, 190 A. 2d 569 (1963); *Lansdale Borough v. Philadelphia Electric,* 403 Pa. 647, 170 A. 2d 565 (1961); *Duquesne Light v. Upper St. Clair,* 377 Pa. 323, 105 A. 2d 287 (1954); *York Water Co. v. York,* 250 Pa. 115, 95 A. 396 (1915). Indeed, by its opinion in *Duquesne Light Co. v. Monroeville Borough,* 449 Pa. 573, 298 A. 2d 252 (1972), the court again recognizes this purpose. Whether local interference with this policy is expressed in the form of an ordinance or, as in the case at bar, a street occupancy permit, it should not be countenanced. As this Court said in *Fogelsville & T. Elec. Co. v. Pennsylvania*

*P. & L.,* 271 Pa. 237, 240, 114 A. 822 (1921) : ". . . [T]he legislature has the power to determine who shall promulgate and enforce its declared public policy, and, when an agency of the government is selected or created for that purpose, *no other body, judicial, executive or municipal, can step in and, by decree, order, ordinance or otherwise, actively enforce the policy to do other acts in relation thereto, except possibly to sustain the legislatively created or designated body.*" (Emphasis added.) Today's holding, by elevating into an inviolable contract obligation a stereotype permit entered into in a different time and setting altogether, paralyzes the exercise of powers bestowed upon the Public Utility Commission by the legislature and erodes the salutary scheme of comprehensive public utility regulation achieved over the last half a century.

The instant dissent is compelled not only out of regard for the above principle, but also because I am unable to agree with the majority's two main conclusions: (1) that the proportions to be paid in the Broad Street subway project have been both "mutually agreed upon" and "paid" within the meaning of Section 411 (a) of the Public Utility Code, thereby ousting the Commission of jurisdiction to allocate costs; and (2) that even if the Commission has jurisdiction, its order assessing 75 percent of the cost of the project to the City of Philadelphia unconstitutionally abrogates pre-existing contract rights. I address these points in turn.

## I.

### The Jurisdiction of the Public Utility Commission to Allocate Costs

While the jurisdiction of the Public Utility Commission over rail-highway crossings is not unlimited, it is, when it attaches, exclusive. *Pittsburgh Railways v.*

*PUC*, 198 Pa. Superior Ct. 415, 423, 182 A. 2d 80 (1962) ; *Bridgwater Borough v. PUC*, 181 Pa. Superior Ct. 84, 98, 124 A. 2d 165 (1956). Section 409(a) and (b) of the Public Utility Law of 1937, Act of May 28, 1937, P. L. 1053, art. IV, as amended, 66 P.S. §1179 (a) and (b) provides:

"(a) No public utility, engaged in the transportation of passengers or property, shall, without prior order of the commission, construct its facilities across the facilities of any other such public utility or across any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order, shall be so constructed across the facilities of any such public utility, and, without like order, no such crossing heretofore or hereafter constructed shall be altered, relocated or abolished.

"(b) The commission is hereby vested with exclusive power to appropriate property for any such crossing, and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated or abolished, and the manner and conditions in or under which such crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public."[1] Until 1963, §411(a) of the same Act, 66 P.S. 1181(a) also provided in pertinent part: "Such compensation [of adjacent property owners for property taken, injured or destroyed in connection with a crossing], as well as the expense of such construction, relocation, alteration, protection, or abolition of any crossing, shall be borne and paid, as hereinafter provided by the public utilities or municipal corporations concerned, or by the Com-

---

[1] A similar provision investing the predecessor Public Service Commission with similar power was contained in The Public Service Company Law of 1913. Act of July 26, 1913, P. L. 1374, art. V, §12.

monwealth, in such proportion as the commission may, after due notice and hearing, determine, unless such proper proportions are mutally agreed upon and paid by the interested parties."[2]  It will be noted that §409 relates to crossings involving utilities engaged in transportation of passengers or property, and that §411 as above quoted was similarly limited. This limitation reflected the common law rule that no-transportation utilities must relocate solely at their own expense.[3] In 1963, §411(a) was amended to include nontransportation utilities as well, so that the provision quoted immediately above now reads in pertinent part: "Such compensation, as well as the cost of construction, relocation, alteration, protection, or abolition of such crossing, *and of facilities at or adjacent to such crossing which are used in any kind of public utility service,* shall be borne and paid. . . ." (Emphasis added.) The intervening utility appellants, therefore, are now within the ambit of commission jurisdiction unless they have by agreement taken themselves out of it.

The Commonwealth Court concluded, and a majority of this Court agree, that the proportions to be borne by the parties in this case had been both "mu-

---

[2] The parallel provision in The Public Service Company Law was contained in §12 of the Act of 1913.

[3] This common law rule received express recognition in Article V, Section 12 of The Public Service Company Law. No similar provision was contained in the successor Public Utility Law of 1937. This omission was interpreted by the PUC and the Superior Court to be an abrogation of the common law rule. *Dept. of Highways v. PUC*, 185 Pa. Superior Ct. 1, 136 A. 2d 473 (1957); *Delaware River Port Authority v. PUC*, 180 Pa. Superior Ct. 315, 119 A. 2d 855 (1956). We reversed in both cases, holding that to effect a change in the common law, the legislature must express itself in clear and unequivocal language. Section 411 could not be read as such an expression. *Dept. of Highways v. PUC*, 394 Pa. 31, 145 A. 2d 538 (1958); *Delaware River Port Authority v. PUC*, 393 Pa. 639, 145 A. 2d 172 (1958).

tually agreed upon *and* paid" within the meaning of Section 411(a), *supra,* thus depriving the Public Utility Commission of jurisdiction to allocate the costs. The majority rely for this conclusion, as did the court below, on *Philadelphia Electric v. Philadelphia,* 301 Pa. 291, 152 A. 23 (1930). In that case we had occasion to interpret permits similar to those involved here.[4] The Electric Company had sued the City in a common law action in trespass to recover the costs of relocating its facilities during the original Broad Street subway construction. We denied recovery, holding *inter alia,* that the right of plaintiff to occupy the City's streets as evidenced by the permits rested upon contract subject only to the police power and could not be repudiated. It is true that our decision in *Philadelphia Electric* established that the "permits" in question are in fact contracts between the City and the utilities, but it does not follow that that case is controlling here on the question of whether the parties have "agreed upon" the proportions of cost to be respectively borne by them. There are two reasons why *Philadelphia Electric* does not control.

In the first place, §911 of the Public Utility Law, 66 P.S. §1351, directs that: "No contract or agreement between any public utility and any municipal corporation shall be valid unless filed with the Commission at least thirty days prior to its effective date: Provided, That upon notice to the municipal authorities, and the public utility concerned, the commission may, prior to the effective date of such contract or agreement, institute proceedings to determine the reasonableness, legality, or any other matter affecting the validity thereof. Upon the institution of such proceedings, such contract or agreement shall not be effective until the commis-

---

[4] The permits in *Philadelphia Electric, supra,* were issued pursuant to applications made in 1901, 1914 and 1916.

sion grants its approval thereof: Provided further, That nothing in this section shall be construed to apply to contracts or agreements between any public utility and any municipal corporation which provide only for the furnishing of service at the regularly filed and published tariff rates." When this section is read in conjunction with §411, it is readily apparent that any prior agreement must receive the imprimatur of the Commission before its jurisdiction relative to cost allocation will be ousted. Because §911 applies to *all* contracts between a municipality and a utility, not just to those involving some particular area of Commission concern such as crossings or rates, it is of no consequence that the permits in question did not relate particularly or expressly to crossings. When the Commission allocates costs for work done at a rail-highway crossing, it is exercising part of its delegated police power to insure that the work is performed compatibly with the public interest. To allow the parties to agree on the proportions of contribution without Commission approval or veto-power would frustrate this exercise of the police power. Such a view is consistent with our prior holdings that statutory requirements for the execution of contracts are mandatory, not merely directory. *Carnegie Natural Gas Co. v. Allegheny County,* 406 Pa. 134, 176 A. 2d 630 (1962). In *Carnegie,* failure of the gas company to file with the Public Service Commission a 1929 contract with the county under a similar provision of The Public Service Company Law[5] foreclosed recovery based on the contract some thirty years later. We discerned in §911 a substantial public policy consideration to protect the municipality and its

---

[5] "No contract or agreement between any public service company and any municipal corporation shall be valid unless approved by the commission. . . ." Act of July 26, 1913, P. L. 1374, art. III, §11.

residents from an improvident contract with a utility. In its role as wielder of the police power, the Commission also has a concern to insure that for their customers' sake, utilities enter into contracts with municipalities which are not improvident as to the utilities. There is consequently no good reason to deny to utilities the right to enforce unfiled contracts, but to allow, as the instant decision does, such enforcement by municipalities.

I recognize that two of the permits involved in *Philadelphia Electric, supra,* like all of those involved in the present case, were issued subsequent to enactment of The Public Service Company Law and were thus subject to the same filing requirement referred to in the *Carnegie* case.[6] The question of filing, however, was not raised or considered in *Philadelphia Electric,* nor was the power of the Public Service Commission involved. That decision, therefore, cannot be binding on the appellant Commission or the intervening appellant utilities in the case at bar, and the majority's reliance on *stare decisis* is in my view beside the point.

The second factor distinguishing *Philadelphia Electric* from the case at bar is that in *Philadelphia Electric,* no crossing was involved. The utility was ordered to relocate its facilities by the City Board of Highway Supervisors, which has jurisdiction over City-owned streets.[7] Here the case is concerned not with what the

---

[6] At least one permit in *Philadelphia Electric* was issued prior to 1913. See footnote 6, page 7. In *Collingdale Borough v. Philadelphia Rapid Transit Company,* 274 Pa. 124, 117 Atl. 909 (1922), we held that the filing requirement of the Public Service Company Law was not retroactive.

[7] The majority opinion omits, in its rendition of the clauses in the permits as quoted in footnote 3 thereof, what to me is an important reference to the Board of Highway Supervisors. The complete clause reads as follows: "If, in the laying of water or gas pipes, sewers, or any other municipal work, it shall become

Board of Highway Supervisors has directed; for aught that appears, it has directed nothing. This entire case is concerned with *crossings,* and the Commission, by reason of its statutory jurisdiction over rail-highway crossings, has necessarily been injected as a third party to the proceedings. Unlike *Philadelphia Electric,* the case at bar does not involve the relocation of utility lines longitudinally laid under or in City streets where no rail-highway crossing is involved. In that situation, where the Commission is not concerned, there is no reason why the permits even today may not be enforced in accordance with their terms. Those terms do not, however, constitute "mutually agreed upon" proportions of *crossing* relocation costs under the terms of §411(a) of the Public Utility Law.

Even to hold, however, as the majority does, that the occupancy permits constituted "mutual agreement" within the meaning of §411 is not to end the matter, for "[to] deprive the commission of jurisdiction in allocating the cost, the proportions must be paid, as well as be agreed upon; that is, the agreement must be actually carried into effect, pursuant to its terms." *Penna. R.R. v. Public Service Commission,* 127 Pa. Superior Ct. 544, 552, 193 Atl. 127, 130 (1937). The Commonwealth Court held, and the majority of this Court apparently agrees, that the proportions had been "paid by the interested parties" pursuant to the preliminary order of the Commission issued May 5, 1969, and that the final order of June 1, 1970 merely directed a 75 percent reimbursement by the City to the utility appellants. This conclusion is untenable because it results in the anomolous situation that when, without hearing

---

necessary to change the location of any of the conduits, manholes or other structures, they shall be shifted or altered at the cost or expense of the owners, to such places *as shall be directed by the Board of Highway Supervisors.*" (Emphasis added.)

or other detailed study, the Commission orders an *initial* allocation, it thereby divests itself of power to direct a *permanent,* different distribution of costs. This is not to say, as the majority suggests, that the provision requiring payment is thereby rendering meaningless and the Commission is empowered to allocate costs in all cases as it sees fit. Rather, it interprets Section 411(a) to cover those situations where payment is made *volitionally* by the parties pursuant to their agreement, and not under mandate from the Commission. As that was not the case here, I would hold that the proportions had been neither "paid" nor "mutually agreed upon" within the meaning of the statute.

## II.
### Power of the Commission to Disregard the Permit Provisions

The court holds that even if the Commission's jurisdiction to allocate the costs of the present relocations has not been prevented from attaching by the street occupancy permits, the Commission's power is circumscribed by the provisions of those permits and our previous decision in the *Philadelphia Electric* case, *supra,* wherein we recognized their contractual nature; specifically, as I read the majority opinion, any allocation different from that contained in the street occupancy permits would constitute an abrogation of preexisting contract rights.

As previously indicated, it is a fair interpretation of the permits that they do not even cover the instant situation; i.e., they were meant to apply to situations where the City is in sole control of changes ordered by it as a public project, and not to situations where the State, acting through the Commission, has preempted the field. Assuming *arguendo,* however, the applicability of the permits to the crossings which are involved

in the case at bar, repeated pronouncements of this and other courts have long recognized the supremacy of the State's police power over streets. As we said long ago in *Scranton Gas Co. v. Scranton City*, 214 Pa. 586, 590-91, 64 Atl. 84 (1906): "Calling the legislative grant of privilege to use the streets a contract does not avoid the conditions on which the privilege is to be exercised. Whether such limitation or conditions be expressed in the grant or not is immaterial, for, as said in *Butchers' Union Slaughter House v. Crescent City Live Stock Landing Co.*, 111 U.S. 746, the power to control and regulate the streets so as to protect the public health, is one that cannot be bargained away by legislative or municipal grant. The power to control them for the protection of public safety, if not the same, stands on equally high ground. All authorities agree that such right is both paramount and inalienable." See also, *Trenton v. New Jersey*, 262 U.S. 182 (1923); *Worcester v. Worcester Consol. Street R. Co.*, 196 U.S. 539 (1905); *Philadelphia Electric, supra*. Sections 409 and 411 of the Public Utility Law and parallel provisions of the prior Public Service Company Law were enacted by virtue of the State's police power. It follows that although a contract between a municipality and a utility may be valid when made, the parties will not necessarily and ipso facto be relieved of liability for a share of the costs imposed by the Public Utility Commission in a future crossing proceeding; the contract is considered to have been made subject to the implied condition that the future exercise of the police power may require a different allocation in the public interest. *Swarthmore Borough v. Public Service Commission*, 277 Pa. 472, 121 Atl. 488 (1923); *Collingdale Boro. v. Phila. R.T. Co.*, 274 Pa. 124, 117 Atl. 909 (1922); *Pittsburgh Rwys. v. PUC*, 198 Pa. Superior Ct. 415, 182 A. 2d 80 (1962); *Pa. R.R. v. PUC*, 154 Pa. Superior Ct. 86, 35 A. 2d 588 (1944); *Wilkes-Barre*

*Railway Corp. v. P.S.C.,* 124 Pa. Superior Ct. 362, 188 Atl. 546 (1936) ; *Vernon Twp. v. P.S.C.,* 75 Pa. Superior Ct. 54 (1920).

It cannot be doubted, and the appellees concede that the police power allows the Commission to order them to pay a proportion of the costs initially so that the crossing can be constructed safely. The majority holds, however, that once the project is completed, it is of no concern to the public or the Commission how the parties previously have agreed among themselves to divide the expense; this remains a strictly private matter and is legally enforceable. In support, the court cites our decisions in *Pgh. & Lake Erie R.R. v. McKees Rocks Boro.,* 287 Pa. 311, 135 Atl. 227 (1926) and *Director General of Railroads v. West Penn Railways Co.,* 281 Pa. 309, 126 Atl. 767 (1924). In both of these cases, the Public Service Commission had made an allocation of costs inconsistent with pre-1913 contracts and the aggrieved utility was later allowed recovery on the contract in a court of law.

In light of the important public interest involved in the ultimate costs to be borne by parties concerned with crossing construction work, it is my view that the cited cases, to the extent that they purport to limit the State's police power in Commission proceedings to insuring safety at crossings and to reviewing rate schedules, should be considered no longer authoritative. The reasoning of the Superior Court in *Dept. of Highways v. PUC,* 185 Pa. Superior Ct. 1, 7, 136 A. 2d 473 (1957), rev'd. on other ground, 394 Pa. 31, 145 A. 2d 538 (1958), appeals to me as persuasive: "The cost of relocating the utilities enters into the rate structure of the public utility companies, and is paid for by the companies' rate payers. It is error to intimate or suggest that such cost is borne by the officials or even the stockholders of the companies. The question of whether the cost of the required relocation of telephone poles

erected upon the rights-of-way with authority of the Commonwealth, should be paid on the telephone bills or at the gasoline pumps has been a matter of governmental concern for some years."

There can be no doubt that by §911 of the Public Utility Law the Commission has been given power to pass upon contracts between any public utility and any municipal corporation. Today's decision limits the exercise of that power to contracts which "directly influenc[e] rates or actual operations of the public utility". (See the court's opinion, supra, p. 410). In my judgment this limitation may seriously undermine effective utility regulation in Pennsylvania; what will not pass muster directly may now be attempted indirectly. To me, §911 itself is a clear indication that the legislature did not intend such a restrictive application of its delegation of the state's police power to the Commission. As discussed above, by granting to the Commission power to review *all* contracts entered into between public utilities and municipalities, not just those involving rates and crossings, the legislature recognized the public interest inherent in all such public contracts and empowered the Commission, in cases where it has jurisdiction, to exercise the State's police power over the entire contract field.[8]

What no doubt troubles the majority of the court is that the intervenor utilities have for many years

---

[8] Section 920 of the Public Utility Law of 1937, 66 P.S. §1360, is consistent with this interpretation of the reach of the Commission's police powers. It provides in pertinent part: "The Commission shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any contract heretofore or hereafter entered into between any public utility and any person, corporation, or municipal corporation, which embrace or concern a public right, benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or concerned with the public interest and the general well-being of the Commonwealth."

received a free ride, so to speak, under South Broad Street, and now are ordered to shoulder only 25% of the cost of relocation at crossing sites to accommodate the new subway. This concern, however, is not properly directed to an attack on the power of the Commission in the first instance to make such an allocation; it should rather take the form of questioning whether the proportions decided upon represent a proper exercise of discretion. As this issue has not entered into the majority's discussion, any extended treatment of it on my part would serve no useful purpose. I may say, however, that the 75:25 ratio adopted by the Commission seems to be justified under the evidence, and that no abuse of discretion or error of law by the Commission is apparent from the record.

For all the reasons stated above, I would reverse the order of the court below and reinstate the order of the Public Utility Commission.

Mr. Justice ROBERTS joins in this dissent.