842 A.2d 369

**CONSOLIDATED RAIL CORPORATION, Appellee**

**v.**

**CITY OF HARRISBURG and the Harrisburg Authority, Appellants.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 2003.

Decided Feb. 18, 2004.

J. Bruce Walter, Harrisburg, James Hughes Cawley, for City of Harrisburg and the Harrisburg Authority.

Benjamin Charles Dunlap, Jr., Harrisburg, for Consolidated Rail Corporation.

BEFORE: CAPPY, C.J., AND CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN AND LAMB, JJ.

## *OPINION*

Justice SAYLOR.

The question presented is whether, and to what extent, the jurisdiction vested in the Pennsylvania Public Utility Commission to allocate relocation costs for facilities of non-transportation utilities arising from improvements to rail-highway crossings forecloses judicial enforcement of preexisting, private, cost-allocation agreements through subsequent civil proceedings.

This appeal arises from the relocation of a segment of a water line constructed by the City of Harrisburg (the "City") in 1941 and later transferred to the Harrisburg Authority (the

"Authority," and, together with the City, "Appellants"), pursuant to a sale-and-lease-back arrangement. The relevant portion of the line lies beneath railroad tracks situated in a private right-of-way owned by Consolidated Rail Corporation ("Conrail"), at the location of their crossing under a bridge carrying the City's Maclay Street. The repositioning became necessary due to alterations to the rail-highway crossing site undertaken at Conrail's behest, designed, *inter alia,* to increase vertical clearance limits to permit transportation of double-stacked container cars.

Central to the ensuing dispute over responsibility for the relocation costs, in 1941, Conrail (via a predecessor-in-interest, the Pennsylvania Railroad Company) and the City entered into an agreement enabling the City to construct and maintain the water line in the railroad right-of-way at the Maclay Street crossing. The agreement entailed no charges or rental obligations, but the City, and its successors and assigns, were made responsible for future relocation of the line at the railroad's request.[1]

Conrail's formal efforts to implement the relevant improvements to the crossing commenced in 1994. Since rail-highway crossings are regulated by the Pennsylvania Public Utility Commission (the "PUC" or the "Commission"), *see* 66 Pa.C.S. §§ 2702, 2704, Conrail sought and obtained the agency's approval to proceed, initially at its own expense, but subject to a subsequent determination by the Commission pursuant to Section 2704(a) of the Public Utility Code, 66 Pa.C.S. § 2704(a), which invests the PUC with jurisdiction to allocate costs arising, *inter alia,* from facility relocation due to altera-

---

1. In this regard, the agreement prescribed:

   If, as and when requested by the Railroad Company so to do, the City shall, at its sole cost and expense, promptly change the location of so much of said facilities as are over, upon or in the private property of the Railroad Company to another location to permit and accommodate changes of grade or alignment of, and improvements in or additions to, the facilities of the Railroad Company upon land now or hereafter owned or used by it, to the intent that said facilities shall at all times comply with the terms and conditions of the Agreement with respect to the original construction thereof.

tions to rail-highway crossings.[2]   Upon completion of the work, Conrail pursued, in the administrative forum, reimbursement from Appellants for the expenses it incurred in the relocation of the water line, in the amount of $461,501.70. Appellants denied responsibility for the charges and sought reimbursement from Conrail for $7,783.70 in costs, which they alleged that they had incurred in connection with the relocation.

At an evidentiary hearing before an administrative law judge (the "ALJ"), Conrail advanced its right to reimbursement pursuant to its 1941 agreement with the City, emphasizing that Appellants benefited from the location of the water line in its private right-of-way, rent-free, for more than fifty years, and from the increased life expectancy of the newly installed line.   Appellants denied the accrual of any benefit to them or their ratepayers, argued that they would not have improved the line but for Conrail's project, and asserted that the PUC was authorized to allocate costs without regard to the 1941 agreement.   Considering the parties' respective positions, the ALJ concluded that the 1941 agreement should not be deemed dispositive in the assignment of costs.   Instead,

---

**2.** Section 2704(a) prescribes as follows:

(a) General rule.—The compensation for damages which the owners of adjacent property taken, injured, or destroyed may sustain in the construction, relocation, alteration, protection, or abolition of any crossing under the provisions of this part, shall, after due notice and hearing, be ascertained and determined by the commission.   Such compensation, as well as the cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided in this section, by the public utilities, municipal corporations, municipal authority or non-profit organization authorized under section 2702(h) (relating to construction, relocation, suspension and abolition of crossings) concerned, or by the Commonwealth, in such proper proportions as the commission may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties.

66   Pa.C.S. § 2704(a).   In *City of Philadelphia v. Philadelphia Elec. Co.*, 504 Pa. 312, 473 A.2d 997 (1984) *("City of Philadelphia II ")*, this Court determined that the Commission's jurisdiction to allocate costs under Section 2704(a) attaches in the absence of voluntary payment pursuant to a cost-allocation agreement among affected parties.   *See id.* at 324–25, 473 A.2d at 1003–04.

upon consideration of a series of factors, he recommended that each party bear its own costs.[3] Centrally, the ALJ believed that the equities favored Appellants' position, since Conrail received the vast majority of the benefit from the track-lowering project. He also refused Conrail's request to include in his recommendation a proviso that the PUC's order should be without prejudice to vindication of the parties' rights under private agreements in a court of law.

On consideration of Conrail's exceptions, the Commission issued an opinion and order adopting the recommended decision of the ALJ, with the significant exception that it included the without-prejudice provision that Conrail had requested. Although in its associated discussion, the Commission initially characterized its jurisdiction to allocate costs arising from alterations to rail-highway crossings as exclusive, *see In re Application of Consolidated Rail Corp.*, A–00111494, *slip op.* at 12 (Pa.PUC. Sept. 19, 1997) ("In order to promote the safety of the public, the Commission has the exclusive power to determine the manner in which rail/highway crossings may be altered (including rehabilitation) and the exclusive power to determine which party or parties shall bear the costs associated with such alteration and future maintenance of rail/highway

**3.** The factors deemed relevant by the ALJ were as follows: (1) "The current City personnel involved in this project did not know of the 1941 Agreement until September, 1994"; (2) "The City began objecting to its being responsible for the water line relocation costs in October, 1994"; (3) "The City could have taken legal action to stop/delay the water line relocation and/or track lowering, but didn't"; (4) "The City regularly put its two-cents in regarding ongoing or planned work by commenting on the choice of contractors and how the work should be done"; (5) "The City urged that the work be done at the least cost"; (6) "The City's water line has been located, cost free, for 56 years, in Conrail's private right-of-way"; (7) "Conrail's assertion that its track-lowering and inter-modal terminal expansion will improve the City's transportation system and/or provide more job opportunities is speculative at best"; (8) "In the instant situation Conrail's state funding ... cannot be used to reimburse the City for water line relocation costs"; (9) "The City has no available funds to pay for relocation costs, apart from increasing its customers' water rates. These rates already have been increased in the past few years"; (10) "At the time of the relocation, the City's water line had a remaining life expectancy of 50 years"; and (11) "A section of the relocated water line was installed at an angle, making future maintenance/repairs more difficult or costly."

crossings."), it explained its decision to expressly limit the effect of its order very briefly, as follows: "Consistent with Commission precedent, retention of this language in the final Order recognizes the rights of the parties." *Id.*

Conrail did not appeal the Commission's order, but rather, commenced the instant civil action in the court of common pleas, grounded in theories of express contract and *quantum meruit.* Appellants filed preliminary objections, questioning the court's subject matter jurisdiction, invoking the doctrine of *res judicata,* and lodging a demurrer to the complaint; after the trial court overruled these objections, Appellants filed a motion for summary judgment, again invoking the PUC's decision as preemptive. The trial court also denied this motion, however, distinguishing administrative cost-allocation matters from judicial enforcement of contractual rights. *See Consolidated Rail Corp. v. City of Harrisburg,* No. 3780 S 1998, *slip op.* at 7 (C.P. Dauph. June 5, 2002). In this regard, the court emphasized Conrail's claim of a bargained-for exchange in which it granted the City permission to traverse its private right-of-way solely on the condition that the City underwrite costs of any required relocation. The court explained:

> Our Courts have said, and we do not question the holdings, that exclusive jurisdiction, once it attaches in rail-highway cases, is retained by the PUC unless the parties have executed a mutual agreement and payments toward that agreement have been made. In fact, we agree with our Courts in the vast majority of situations. However, this set of facts is different. In this case, the PUC has allocated the costs of the relocation to the detriment of and in violation of the basic contractual rights of the plaintiff.
>
> We are not attempting to circumvent the PUC's exclusive authority to allocate relocation expenses. We merely are enforcing the basic contractual rights of an injured party should it be determined that such rights exist and have been violated. The allocation of the costs of relocation is finished. The PUC has spoken on the matter. Now, the matter of

the contractual rights and remedies for breaches of those rights, an entirely separate matter, is before us.

Even the PUC acknowledged the possible contractual rights of the parties and entered [its] order without prejudice, allowing the parties to attempt recovery of incurred costs in accordance with lawful agreements between the parties.

*Id.* at 8 (citations omitted).

On a permissive interlocutory appeal, *see* Pa.R.A.P. 1312, the Commonwealth Court affirmed via memorandum opinion on the basis of the trial court's opinion, with Judge Leadbetter dissenting without opinion.

■ We allowed appeal primarily to consider Appellants' contention that, absent a paid, private cost-allocation agreement, the PUC has exclusive jurisdiction under Section 2704(a) to finally determine who will bear and pay facility relocation costs at rail-highway crossings.

■ Presently, Appellants contend that the trial court failed to afford meaning to Section 2704(a)'s directive that rail-highway crossing facility relocation costs "shall be *borne and paid* ... in such proper proportions as the commission may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties." 66 Pa.C.S. § 2704(a) (emphasis added). According to Appellants, this plain language mandates that, once the Commission allocates costs, the party or parties found responsible must bear and pay them, unless relieved of such obligation in the course of an appropriate appeal from the PUC's order. Appellants argue that it would render the statutory scheme nugatory if parties deemed responsible by the Commission might nevertheless seek enforcement of private cost-allocation agreements in separate civil proceedings, efforts which Appellants denote as improper collateral attacks on the Commission's decision making. In this regard, Appellants draw support from this Court's characterization of the Commission's cost-allocation decision making authority as exclusive, *see, e.g., City of Philadelphia II,* 504 Pa. at 323, 473 A.2d at 1002–03; Mr. Justice Hutchinson's concurring opinion in

*City of Philadelphia II,* 504 Pa. at 325, 327–28, 473 A.2d at 1004, 1005 (Hutchinson, J., concurring) (describing the Commission as the "sole forum for finally determining the appropriate cost allocation" in connection with rail-highway improvements); and this Court's recent endorsement of central aspects of Justice Hutchinson's concurrence in *AT & T v. Pennsylvania PUC,* 558 Pa. 290, 305, 737 A.2d 201, 209 (1999). Appellants argue that Conrail's contrary interpretation would undermine statewide uniformity in the regulation of rail-highway crossings, in derogation of the intent of the General Assembly and the interests of the public at large.[4]

Conrail, on the other hand, emphasizes that, as an administrative agency, the PUC's power is defined by the terms of its enabling statute, here, Section 2704(a), which does not purport to confer the authority to divest courts of law of jurisdiction to determine and enforce rights under a pre-existing contract or otherwise establish universal exclusivity in the administrative cost-allocation procedure. Rather, Conrail contends that the Legislature's guiding focus was to enable the Commission to assign costs responsibility in the first instance, so as to ensure timely and effective completion of work in an arena in which public safety concerns are paramount. Indeed, Conrail notes that appellate courts have specifically found that Section 2704(a) and its predecessors permit enforcement of contractual rights in courts of law notwithstanding prior, discretionary cost allocations by the PUC.[5] In response to the City's

4. Appellants also argue that the doctrines of *res judicata* and administrative finality foreclose Conrail's civil proceeding. The doctrine of *res judicata,* however, cannot be deemed controlling, since the Commission expressly excepted contractual issues from the purview of its decision making. *See generally In re Estate of R.L.L.,* 487 Pa. 223, 228 n. 7, 409 A.2d 321, 323 n. 7 (1979) (indicating that the doctrine of *res judicata* or claim preclusion applies to matters "actually decided" in former proceedings). Similarly, as the Commission's order was not crafted as a final one with respect to the parties' contractual entitlements, administrative finality cannot have obtained as such.

5. *See, e.g., Pittsburgh & Lake Erie R.R. Co. v. Borough of McKees Rocks,* 287 Pa. 311, 321, 135 A. 227, 230 (1926) (holding that a Public Service Commission cost allocation "contains no ruling or attempt to rule that, after the parties concerned have responded to the order of the commission, they are debarred from enforcing the contract between them-

contention that such decisions were overruled by *City of Philadelphia II* and *AT & T*, Conrail explains that neither of these cases pertained to post-administrative-allocation enforcement of private contracts (rather, both focused on the precept that the PUC remains unfettered in its ability to make a discretionary allocation of costs absent voluntary payment of relocation costs pursuant to an agreement); nor did either reference the decisions that Appellants claim were overruled. With regard to Appellants' contention concerning adoption of Justice Hutchinson's *City of Philadelphia II* concurrence, Conrail observes that the *AT & T* Court did so only to the extent that it was concerned with the case's central focus, again, the contours of the PUC's discretionary authority to allocate costs in the first instance. *See AT & T*, 558 Pa. at 304–05, 737 A.2d at 209. Additionally, Conrail invokes this Court's more general decisions taking note of the Legislature's intention that the PUC should not become embroiled in contract enforcement matters that are more properly left to the civil courts, *see, e.g., Feingold v. Bell of Pa.*, 477 Pa. 1, 9–11, 383 A.2d 791, 795–96 (1978).

Conrail also offers policy reasons for distinguishing between the PUC's cost allocation function and the courts' obligation to interpret and enforce contracts. Chiefly, Conrail observes that the Commission's administrative expertise relates to public safety matters, not litigation of contract disputes; therefore, the agency's equitable jurisdiction under Section 2704(a) to allocate costs should be deemed to extend only so far as necessary to accomplish this underlying, public purpose. Conrail contends that a civil action grounded on a pre-existing contract will have no impact on the Commission, its mission, or its cost allocation decisions; moreover, according to Conrail, failure to enforce contractual rights would result in untenable

selves"); *Director General v. West Penn Rys. Co.*, 281 Pa. 309, 312–13, 126 A. 767, 769 (1924) (upholding judicial enforcement of a private security-labor-division contract notwithstanding a prior cost allocation determination by the Commission); *Pennsylvania PUC v. SEPTA*, 21 Pa.Cmwlth. 106, 110, 343 A.2d 371, 374 (1975) (indicating, in reference to a PUC cost allocation determination that, "after the [PUC] has fixed the liabilities of those concerned to the public, such persons are then referred to a court of law to have adjudicated their contract rights").

uncertainties in commercial affairs. Indeed, Conrail observes that it would lack any incentive to permit the use of its property to carry other utilities' facilities, particularly on an uncompensated basis, if it could not be reasonably assured that relocation costs would be borne by those other utilities. Thus, Conrail maintains, the PUC's jurisdiction over cost allocations does not conflict with a trial court's jurisdiction over a related contract matter, as each tribunal functions within its own independent legal sphere.

The Commission also filed a brief, as *amicus curiae* in support of Conrail's position. Unlike Conrail, however, the Commission acknowledges that its jurisdictional mandate is an expansive one and includes the power to assess private contractual disputes regarding payment of costs of altering rail-highway crossings. The PUC contends only that such jurisdiction is not exclusive, and therefore, does not in and of itself foreclose the ability of parties to enforce an alternative allocation of costs among the parties pursuant to a private contract. In this regard, the Commission deems its cost-allocation function secondary to its primary mission of assuring public safety at rail-highway crossings. In fact, the Commission also takes the position that disputes as to the enforcement of contracts are best left to the civil courts, particularly where, as here, there is some uncertainty, or at least a dispute, concerning the validity, applicability, and/or enforceability of the contract in issue. The Commission suggests that its jurisdictional mandate represents a legislative application of the doctrine of primary jurisdiction, pursuant to which deference is afforded to agency determinations in areas of their expertise.[6]

Our review of the legal issues presented is plenary; however, as concerns the Commission's interpretation of its own enabling legislation, we proceed with due deference. *See*

6. The Commonwealth, Department of Transportation, which frequently acts as a conduit for state and federal funding of highway, bridge, and rail-highway crossing construction projects and is a party to many reimbursement and cost-allocation agreements, has also filed an *amicus* brief supporting Conrail's position.

*Anela v. Pennsylvania Hous. Fin. Agency,* 547 Pa. 425, 428, 690 A.2d 1157, 1159 (1997).

At the outset, we reject the position of the trial court, adopted by the Commonwealth Court, that Commission cost-allocation determinations and awards of monetary damages in courts of law pursuant to related, private cost-allocation agreements can be viewed as entirely distinct with regard to subject matter. To the contrary, a central focus of each respective inquiry is the appropriate assignment of costs, here, for example, concerning relocation of the City water line at the Maclay Street crossing. Furthermore, this Court has endorsed the PUC's position that it possesses jurisdiction to address contractual obligations within the context of a Section 2704(a) cost-allocation decision. *See AT & T,* 558 Pa. at 307 n. 11, 737 A.2d at 210 n. 11. Thus, while certainly contractual remedies can include matters that may be considered beyond the realm of traditional cost allocation, such as consequential damages, there is nevertheless considerable overlap in the essential administrative and judicial review where private agreements are among the factors in issue.

Given this overlap, the Commission's simultaneous assertion of exclusivity in its jurisdiction to allocate costs of facility relocation at rail-highway crossings,[7] and issuance of decisions that are expressly without prejudice to civil enforcement of

7. *See, e,g, Application of Consol. Rail Corp.,* A–00111494, *slip op.* at 12; *see also In re Nat'l R.R. Passenger Corp.,* No. I–00000088, *slip op.,* 2003 WL 21702948 (Pa.P.U.C. June 17, 2003) ("There is little doubt that the Commission has the exclusive jurisdiction to allocate costs in a manner it determines is just and reasonable in rail/highway matters."); *In re Consol. Rail Corp.,* 95 Pa. P.U.C. 24, 25 (2001) ("The Commission has the exclusive authority to assess the costs of construction, relocation, alteration, protection or abolition of any crossing upon the concerned parties to this proceeding [in] such proportions as the Commission may determine." (citing 66 Pa.C.S. §§ 2702(c), 2704(a))); *In re Pa. Dep't of Transp.,* 69 Pa. P.U.C. 292, 298 (1989) ("[T]he Commission has the exclusive authority to assess the costs of any work ordered performed upon the parties to this proceeding in such proper proportions as this Commission may determine."); *In re Mifflin County,* 66 Pa. P.U.C. 135, 141 (1988); *In re Dep't of Transp.,* 65 Pa. P.U.C. 340, 348 (1987); *In re State Highway Route 35069,* 62 Pa. P.U.C. 257, 265 (1986) ("Commission has the sole authority to allocate costs and assign maintenance responsibilities in rail highway crossing cases.").

related, private, cost-allocation agreements,[8] has fostered considerable confusion. This is particularly the case, since, in its conventional sense, exclusive jurisdiction connotes power possessed to the exclusion of its exercise in other tribunals. *See, e.g., Harris–Walsh, Inc. v. Borough of Dickson City*, 420 Pa. 259, 270–71, 216 A.2d 329, 334 (1966).

To date, the judicial decisions have not rectified this confusion, and, to some degree, have contributed to it. Through *City of Philadelphia II*, the law was fairly well settled that, while Section 2704(a) and its predecessors authorized an administrative allocation of facility relocation costs at rail-highway crossings, they did not supplant the common pleas courts' jurisdiction over related contractual undertakings. *See, e.g., supra* note 5 (citing cases). Indeed, in *dictum* in *City of Philadelphia v. Pennsylvania PUC*, 449 Pa. 402, 296 A.2d 804 (1972) ("*City of Philadelphia I*"), this Court went so far as to state that the Commission lacked jurisdiction to assign costs in the face of a pre-existing or contemporaneous cost-apportionment agreement, as follows:

> We read [Section 2704(a)'s predecessor] to mean that the Commission may exercise its jurisdiction to allocate costs only in the absence of an agreement respecting cost apportionment among the parties.... No public interest is served by permitting the Commission to exercise the authority to allocate costs between the parties when the condition precedent to the exercise of that authority, *i.e.*, the failure of these parties to reach an agreement respecting cost allocation, has not transpired.

*id.* at 409, 296 A.2d at 807–08.

However, in *City of Philadelphia II*, the Court abandoned this position. Without explicit commentary concerning the presence and/or extent of jurisdiction in courts of law as reflected in the prior decisional authorities, the Court cement-

8. *See, e.g., Application of Consol. Rail Corp.*, A–00111494, *slip op.* at 14; *see also AT & T*, 558 Pa. at 299, 737 A.2d at 206; *National R.R. Passenger Corp.*, I–00000088, *slip op.*, 2003 WL 21702948; *Rhodes v. Southwest Pa. Ry. Corp.*, 94 Pa. P.U.C. 17, 26 (2000); *In re Pa. Dep't of Transp.*, 76 Pa. P.U.C. 155, 158 (1992); *Posey v. SEPTA*, No. C–19036, *slip op.*, 1979 WL 61497 (Pa.P.U.C. Mar.8, 1979).

ed the Commission's characterization of its cost-allocation jurisdiction as exclusive once it attaches. *See City of Philadelphia II*, 504 Pa. at 323, 473 A.2d at 1003. Additionally, *City of Philadelphia II* broadened the scope of the Commission's jurisdiction to all cases in which preexisting or contemporaneous agreements exist, but relocation expenses have not yet been voluntarily paid pursuant to such agreements. *See id.* at 324–25, 473 A.2d at 1003–04. The decision culminated in the Court's observation that:

> Because the legislature, in its wisdom, has made the existence of an executed agreement the test for the Commission's jurisdiction, a mere agreement without payment is of no significance in allocation proceedings before the Commission. Parties are thus encouraged to carry out their agreements promptly. At the same time, the Commission is spared the onerous and inappropriate task of determining the validity of private agreements, and is permitted to allocate all uncompensated expenses in a fair and expeditious manner.

*Id.*

In *AT & T*, the Court clarified that the *City of Philadelphia II* Court's discussion concerning the significance of private agreements, while relevant to the attachment of the Commission's jurisdiction in the first instance, should not be deemed to control the substantive aspect of cost-allocation inquiries. *See AT & T*, 558 Pa. at 307 & n. 11, 737 A.2d at 210 & n. 11. Thus, *AT & T* allowed for the consideration of private agreements within the Section 2704(a) inquiry, despite the contrary *dictum* from *City of Philadelphia II*. *See id.* Additionally, the discussion in *AT & T* suggested that Section 2704(a) laid the groundwork for a final and exclusive cost allocation in a proper "agreements" case, in which the Commission would fully consider and give due and appropriate weight to clear and binding, private cost-allocation contracts. *See id.* at 305 & n. 8, 737 A.2d at 209 & n. 8. Obviously, such action on the part of the Commission, where feasible, would spare the parties the

expense of dually litigating overlapping allocation issues in both the administrative and judicial arenas.[9]

In neither *City of Philadelphia II* nor *AT & T*, however, did the Court consider the ability of courts of original jurisdiction to enforce related, private agreements subsequent to a Section 2704(a) allocation by the Commission either in general, or in circumstances where, as here, the Commission, in the exercise of its administrative expertise and judgment, has declined to finally resolve the contractual matters.

Despite the PUC's and this Court's prior characterizations of the Commission's jurisdiction to allocate facility-relocation costs at rail-highway crossings as exclusive, substantial reasons support the view that Section 2704 does not divest the common pleas courts of jurisdiction to enforce private agreements, where the Commission has issued its decision without prejudice to such proceedings. First, this view is consonant with the terms of the relevant provisions of the Public Utility Code—while Section 2702(c) invests in the PUC "exclusive power" to direct, *inter alia,* the relocation of facilities at rail-highway crossings, *see* 66 Pa.C.S. § 2702(c), Section 2704(a)'s cost-allocation proviso contains no such specification of jurisdictional exclusivity. We acknowledge that it would be possible to infer that exclusivity was intended from the Legislature's directive that relocation costs are to be "borne and paid" as directed by the Commission. 66 Pa.C.S. § 2704(a). However, given the public-safety-orientation of the PUC's role in rail-highway crossing matters, *see* 66 Pa.C.S. § 2702(b), and practical realities concerning the character of and resources available in the administrative forum, as well as the scope and potential burden of contract interpretation and litigation,[10] the

---

9. The *Feingold* line of decisions, cited by Conrail, is distinguishable in this regard, as they rely upon the absence of an express statutory grant of power to the Commission to implement sought-after remedial relief. *See, e.g., Feingold,* 477 Pa. at 8, 383 A.2d at 794. Here, the General Assembly has expressly delegated the function of cost allocation for relocation of facilities at rail-highway crossings (the primary remedy sought by Conrail) to the Commission, at least in the first instance.

10. In addition to the greater scope of potential remedies available in a breach-of-contract action, *see supra,* private agreements may entail

Commission's interpretation permitting it latitude to abstain from finally determining the validity and legal effect of agreements, particularly where they are complex or uncertain, is not an unreasonable one. Additionally, this reading best reconciles the decisional law cited by Conrail, *see supra* note 5, with the subsequent decisions of this Court in *City of Philadelphia II* and *AT & T*.[11]

Indeed, the Commission's reference to the doctrine of primary jurisdiction is more practically in line with the statutory scheme than a concept of universal exclusivity. Although this Court's decisions concerning the doctrine of primary jurisdiction have generally concerned its judicial invocation, *see, e.g., Elkin v. Bell Tel. Co. of Pa.,* 491 Pa. 123, 132–34, 420 A.2d 371, 376–77 (1980), statutory primary jurisdiction exists when a legislative enactment "specifically requires courts to apply the primary jurisdiction doctrine to a class of disputes." KENNETH CULP DAVIS AND RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 14.1 (3d ed.1994). While the traditional outcome of an exercise of primary jurisdiction is a binding determination by an administrative tribunal that is not subject to collateral attack in judicial proceedings, *see Elkin,* 491 Pa. at 133, 420 A.2d at 377, the Commission's decision to issue various cost-allocation decisions without prejudice to enforcement of related contractual undertakings represents the agency's delineation of appropriate limits of the binding effect of its determination, based on its assessment of its mission and the range of its expertise. Exercising due deference to the PUC's decision making in this regard, we find no

terms, such as contingencies or provisions that are interdependent with other agreements, outside the primary sphere of the Commission's mission and expertise.

11. Again, although certainly passages from these decisions, particularly *City of Philadelphia II,* may suggest exclusivity in Commission decision making, Conrail is correct in its observation that the facts of neither case directly implicated the exclusivity aspect; rather, both cases concerned the breadth of the PUC's own jurisdiction in the first instance. The same is true of *AT & T's* endorsement of Justice Hutchinson's concurring opinion, which was expressly limited to the commentary concerning *City of Philadelphia II's* actual holding, *see AT & T,* 558 Pa. at 305, 737 A.2d at 209, and not Justice Hutchinson's broader thoughts concerning the decision's impact on exclusivity.

error in its decision in the present case to allocate costs in the first instance, but to leave potential enforcement of the disputed agreement to the judicial forum.[12]

■ We hold that the PUC possesses statutory primary jurisdiction to allocate costs of facility relocation at rail-highway crossings. Such jurisdiction, however, does not yield an exclusive determination in cases in which asserted cost-allocation bargaining is in issue and the Commission acts within the ambit of its discretion to render its directives expressly without prejudice to judicial enforcement of any agreements.

The order of the Commonwealth Court is affirmed.

Former Justice LAMB did not participate in the decision of this case.

12. We acknowledge Appellants' concern with statewide uniformity in cost allocation decision making but believe that such policy is offset by the desirability of reasonable certainty in contractual affairs, particularly since the Commission continues to signal its disinclination to resolve disputed matters of contract in its administrative assignments of costs.