IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading Blue Mountain & Northern  :
Railroad Company,  :
            Petitioner  :
  :
  v.  :  No. 486 C.D. 2023
  :
Pennsylvania Public Utility  :
Commission,  :
            Respondent  :  Argued: May 7, 2024

BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                         FILED: June 4, 2024

Reading Blue Mountain & Northern Railroad Company (Railroad) petitions this Court for review of an April 20, 2023 final order entered by the Pennsylvania Public Utility Commission (PUC) adopting the recommendation of an administrative law judge (ALJ), which concluded that the Railroad should, at its sole cost and expense, reconstruct a public railroad crossing located at State Route 2019 (Crossing) in Pittston Township, Pennsylvania. The Railroad argues on appeal that the Pennsylvania Department of Transportation (DOT)[1] is the party responsible for reconstructing the Crossing. After careful review, we affirm.

## I. Background

On January 13, 2020, the Railroad filed a complaint with the PUC alleging that DOT's failure to maintain the roadway approaches to the Crossing caused the

---

[1] DOT filed a Notice of Intervention with this Court on June 16, 2023.

surface of the Crossing to deteriorate. DOT filed an answer denying the allegation and, in new matter, asserted that the Railroad failed to maintain the Crossing's surface, resulting in a breakdown of the roadway approaches. Field investigations of the Crossing took place on September 30, 2020, and March 31, 2021. During the March 31, 2021 field investigation, a civil engineer with the PUC, William Sinick, noted the poor conditions of both the roadway approaches and the surfaces of the Crossing. Ultimately, the Railroad and DOT reached an agreement regarding their joint responsibility to reconstruct the Crossing and its roadway approaches. The Railroad would replace the Crossing surfaces, which would extend two feet from the outside rail on each set of tracks. The Railroad would also remove the adjacent five feet of base and wearing courses of asphalt on the roadway approaches and provide a new base course of asphalt. DOT would provide the wearing course of asphalt for the roadway approaches. Additionally, DOT would establish and maintain any detours and traffic controls necessitated by the reconstruction. The parties agreed to complete all work by July 31, 2021. The agreement between the Railroad and DOT was memorialized in letters issued by DOT's Secretary on April 30, 2021, and June 28, 2021 (Secretarial Letters).

On December 14, 2021, DOT filed a Motion to Schedule Matter for Hearing, which alleged that the work completed by the Railroad at the Crossing was unsatisfactory. Specifically, DOT asserted that the Railroad changed the grade at the Crossing and elevated the tracks through the Crossing beyond that which previously existed, creating a dangerous transition for vehicles traveling from the roadway approaches. In addition to requesting that the Railroad bear financial responsibility for reconstructing the Crossing, DOT sought reimbursement from the

2

Railroad for $468.36 that DOT spent to erect signage warning drivers of road conditions at the Crossing.

The Railroad submitted the direct written testimony of its Vice President of Asset Management and Community Affairs, Matt Johnson, and its Vice President of Maintenance of Way, Chris Goetz, who oversees track construction and maintenance. The PUC's Bureau of Investigation and Enforcement (Bureau) submitted the direct written testimony of Sinick, who supervises the PUC's rail safety section. DOT presented the direct written testimony of Sarah Fenton, DOT's District Grade Crossing Administrator. Johnson, Goetz, Sinick, and Fenton also testified live before the ALJ at a hearing held on May 24, 2022.

### A. The Railroad's Evidence

Johnson stated that the Railroad initiated this matter due to DOT's failure to maintain the roadway approaches to the Crossing. While the Railroad maintained that DOT was obligated to make repairs to the approaches, it was willing to pay for necessary track work, including superelevation of the track.[2] Johnson stated that superelevation was necessary to accommodate train speeds through the Crossing. Johnson acknowledged that he did not know the speed at which trains traveled through the Crossing or the degree of curvature in the tracks at that location. As of January 2022, Johnson was not aware of any complaints regarding the safety of the Crossing.

Goetz testified that superelevation of the tracks at the Crossing was required by the Federal Railroad Administration (FRA) track safety standards. He advised that the maximum speed for trains at the Crossing was 40 miles per hour. Goetz did not know the degree of track curvature at the Crossing. Goetz was unsure why the

___

[2] Superelevation refers to the increased elevation of the outer rail of a train track over the inner rail, creating a banked turn that allows trains to travel through curves at an increased speed.

3

Railroad did not address superelevation of the tracks with DOT prior to the 2021 reconstruction.

## B. Bureau's Evidence

Sinick testified that he conducted an on-site inspection of the Crossing on August 18, 2021, after the parties had completed the work detailed in the Secretarial Letters. The purpose of the inspection was to discuss a remedy for the "failed reconstruction of the [Crossing]" and the "step-like transition created" between the Crossing and the roadway approaches. Reproduced Record (R.R.) at 73a. In Sinick's opinion, the work completed by the Railroad did not comply with the Secretarial Letters, which did not provide for any changes to the superelevation of the tracks or the grade of the Crossing. Sinick did not believe the increased superelevation was necessary. The increase failed to consider the height of the existing roadway or create a safe and smooth transition from the roadway approaches and the Crossing. Instead, it created a "system of steps" between the roadway approaches and the tracks. *Id.* at 75a. Sinick opined that the Crossing would have to be completely reconstructed and that the Railroad should be "primarily responsible" for bearing the cost of reconstruction. *Id.*

As part of his testimony, Sinick reviewed construction plans for the Crossing dated March 17, 2014, which set forth the Crossing's structure, grade, and track elevations as they existed prior to the 2021 reconstruction. Sinick advised that track geometry was never discussed as part of the Crossing's reconstruction for 2021, and he understood that the 2021 reconstruction project would reestablish the track geometry identified in the 2014 plans. Sinick acknowledged that the Railroad could adjust the superelevation of its tracks "based on [its] approved speed and the existing degree of [track] curvature." R.R. at 224a. Minor adjustments to the superelevation

4

of a track, which Sinick considered to be an "inch and a half," did not require approval by the PUC. *Id.* at 225a. Sinick observed that the Railroad increased the superelevation of the tracks from two and one-half inches to "over five inches." *Id.* at 226a. In addition, the overall elevation of "the whole area that the tracks" ran through was increased. *Id.* The PUC considered this increase an alteration of the tracks, requiring the submission of new construction plans and PUC approval due to changes in the roadway transition into the Crossing, which affected the roadway approaches and drainage, and could potentially require an adjustment to the posted speed limit.

During cross-examination, Sinick acknowledged that he attended the March 31, 2021 field investigation at which reconstruction of the Crossing was discussed. Sinick conceded that he did not ask whether the track geometry would be altered during reconstruction. Sinick advised that any change to track geometry "was never discussed." *Id.* at 232a.

### C. DOT's Evidence

Fenton testified that she "provides coordination between railroads and [DOT]." *Id.* at 103a. She was familiar with the Crossing and the Secretarial Letters detailing the reconstruction of the Crossing. Regarding the timeline for the reconstruction, Fenton stated that DOT first established the necessary detours near the Crossing, after which the Railroad performed its portion of the work. DOT completed its portion of the project thereafter.

Fenton did not observe or oversee the work performed by the Railroad or DOT. Her assistant for railroad projects, Robert Cooper, was occasionally present during the reconstruction. Cooper did not relay any concerns to Fenton regarding the work being performed. DOT was not aware of any issues with the Crossing until

5

after the project was complete and the roadway approaches reopened for vehicular traffic.

Fenton understood that the Secretarial Letters did not provide for increased elevation of the tracks at the Crossing or a change in its grade. The Railroad only identified safety concerns with the original track elevation after it completed repairs at the Crossing, and that "[a]t no point leading up to the [reconstruction] was elevation and/or safety brought up, discussed, or mentioned." *Id.* at 118a. As far as a resolution to the "dangerous situation" at the Crossing, Fenton indicated that DOT would like the Crossing restored to its original elevation, with the Railroad bearing the cost. *Id.*

Fenton advised that a railroad crossing must match the pave structure of the roadway approaches to ensure positive drainage that could otherwise deteriorate the pavement and surrounding areas. Additionally, "[t]oo much or too little pavement" could result in premature failure of the roadway approaches and "create drop-off conditions[.]" *Id.* at 111a. Fenton did not believe a safe and smooth transition existed through the Crossing. Rather, the "step-like" transition caused vehicles to bounce dangerously and erratically when driven through the Crossing. *Id.* at 113a. Fenton stated that the current transition at the Crossing posed a risk to vehicles as well as passengers of motorcycles and bicycles, who could be thrown upon impact with the train rails. Additionally, the train rails could fracture following an impact, creating a danger to the public. Fenton stated that DOT has received numerous complaints about the Crossing claiming vehicle damage and whiplash injuries. DOT erected signage in August 2021 to warn the public of the "hazard at the [C]rossing." *Id.* at 116a. While representatives for the Railroad were present at the August 18, 2021 inspection of the Crossing, they indicated that DOT would be responsible for

6

any additional paving, and the Railroad was not amenable to restoring the Crossing to its original elevation.

The ALJ issued her decision on December 14, 2022, recommending that the Railroad, at its sole cost and expense, perform the work necessary to "make safe" the Crossing and roadway approaches thereto. *Id.* at 384a. The ALJ found that the increased superelevation of tracks at the Crossing was not authorized by the Secretarial Letters. Assuming that the Railroad was required to increase the superelevation of the tracks, the ALJ reasoned that the Railroad should have made the PUC and DOT aware of such a requirement during the planning phase of the Crossing's reconstruction. The ALJ found that, at no point leading up to the reconstruction, was superelevation of the tracks discussed. During the evidentiary hearing, Goetz was unable to explain why the Railroad failed to raise the need for superelevating the tracks prior to reconstruction.

The ALJ accepted Sinick's testimony that the increased superelevation at the Crossing constituted an alteration of the Crossing that required the Railroad to file an application with the PUC. The record demonstrated that the increased superelevation of the tracks "drastically affected" the roadway approaches and transition through the Crossing. *Id.* at 409a. Based on the accepted testimony of Sinick and Fenton, and the numerous complaints received about the Crossing, the ALJ found that the increased superelevation of the tracks, and overall increased grade of the Crossing, posed an ongoing safety hazard to the public that did not exist prior to the reconstruction. The ALJ credited Fenton's testimony, which Sinick corroborated, that the Crossing had to be reconstructed. The ALJ noted that the Railroad did not dispute the unsafe conditions at the Crossing. Rather, the Railroad argued that it should not be responsible for the cost of remediating the problem.

7

The ALJ rejected the Railroad's suggestion that DOT should have asked the Railroad if it intended to raise the tracks at the Crossing prior to reconstruction. While Fenton's assistant, Cooper, was present for some of the work performed at the Crossing, there was no evidence to suggest that Cooper was aware, or should have been aware, of the changes made by the Railroad to the superelevation or overall grade of the tracks. The unsafe conditions at the Crossing could have been avoided if the Railroad had "simply expressed its intent to raise the tracks[.]" *Id.* at 415a.

Ultimately, the ALJ concluded that the Railroad was financially responsible for addressing the unsafe condition of the Crossing. In arriving at this conclusion, the ALJ noted that the Railroad unilaterally decided to raise the tracks at the Crossing. The ALJ could not speculate on what DOT or the PUC would have agreed to had the Railroad disclosed its intent to raise the tracks, as there was no dispute that the Railroad failed to discuss the issue beforehand. Therefore, the ALJ determined that the Railroad, having created the unsafe condition at the Crossing, should bear the sole cost of reconstructing the Crossing to make it safe for the "traveling public." *Id.* at 419a. The PUC adopted the ALJ's recommendation on April 20, 2023. This appeal followed.[3]

## II. Issues

The Railroad argues that any further reconstruction of the Crossing is governed by the April 30, 2021 and June 28, 2021 Secretarial Letters, and that DOT

---

[3] Our review is limited to a determination of whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial competent evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Millcreek Twp. v. Pa. Pub. Util. Comm'n*, 753 A.2d 324, 326 n.3 (Pa. Cmwlth. 2000). Substantial evidence has been defined as such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Millcreek Twp*, 753 A.2d at 326 n.3.

should be liable for any additional construction costs. The Railroad also argues that the PUC improperly relied on Sinick's testimony, and that the Railroad was not required to file an application prior to increasing the grade or elevation of the tracks at the Crossing.

### III. Discussion

Section 2702 of the Public Utility Code, 66 Pa.C.S. § 2702, governs the construction, relocation, suspension, and abolition of railroad crossings. Section 2702(a) states that a public utility, such as the Railroad, shall not "without prior order by the [PUC]" alter a railroad crossing. 66 Pa.C.S. § 2702(a). Section 2702(c) relevantly provides that the PUC has exclusive power to order the alteration of a railroad crossing, and the PUC may order the public utility to perform the alterations. In allocating the responsibility for altering a railroad crossing, the PUC may consider the following factors: (1) the party that originally built the crossing; (2) the party that owned and maintained the crossing; (3) the benefit conferred on each party by the crossing; (4) whether either party is responsible for deterioration of the crossing; and (5) the relative benefit each party will derive from the repair, replacement, or removal of the crossing. *Greene Twp. Bd. of Supers. v. Pa. Pub. Util. Comm'n*, 668 A.2d 615 (Pa. Cmwlth. 1995). The PUC is not limited to any fixed rule when assessing costs, however, and may consider all relevant factors, "with the fundamental requirement that its order be just and reasonable." *AT&T v. Pa. Pub. Util. Comm'n*, 737 A.2d 201, 209 (Pa. 1999).

The Railroad argues that the PUC failed to properly consider the factors established in *Greene* when it adopted the ALJ's recommendation and directed that the Railroad, at its sole expense, repair the Crossing. The Railroad notes that the first and third factors are irrelevant, as neither DOT nor the Railroad built the

9

Crossing, and construction of the Crossing did not confer a benefit on either party. As to the second factor, while the Railroad maintained the railway, DOT was responsible for maintaining the roadway leading to and crossing over the tracks. The Railroad argues that DOT's failure to maintain the approaches to the Crossing caused its deterioration, and any issues with the approaches are DOT's responsibility. The Railroad suggests that its responsibility is limited to making the Crossing safe for train traffic conditions and DOT is responsible for providing safe driving conditions.

We must reject the Railroad's first argument, as the Railroad's application of the *Greene* factors ignores its own responsibility for the present conditions at the Crossing. There is no dispute that DOT contributed to the deteriorated roadway approaches at the Crossing. DOT addressed that issue with the initial repairs performed pursuant to the Secretarial Letters. The current issues at the Crossing are the sole responsibility of the Railroad. Thus, the fourth factor in *Greene* supports the ALJ's recommendation that the Railroad should bear the cost of addressing those problems. Additionally, Section 2702(c) of the Public Utility Code grants the PUC the authority to order a public utility to alter a railroad crossing.

Next, the Railroad argues that the PUC improperly relied on the testimony of Sinick, as no clear written standards exist that specify when the PUC's approval is required to elevate tracks. Therefore, the PUC should have disregarded Sinick's opinion that the Railroad should have filed an application with the PUC before increasing the grade or track elevation at the Crossing.

This argument also lacks merit. Section 2702(a) of the Public Utility Code clearly states that PUC approval must be obtained for any alteration to a railroad crossing. The ALJ credited Sinick's opinion that the Railroad's change to the grade

10

and track elevation at the Crossing created a dangerous transition from the roadway approaches through the Crossing. The ALJ also credited Fenton's testimony that the changes in grade and track elevation were not provided for in the Secretarial Letters. As the Railroad did not have authority under the Secretarial Letters to increase the grade of the Crossing or the elevation of the tracks, the PUC did not err in adopting the ALJ's finding that the Railroad should have filed an application with the PUC to alter the grade and track elevation at the Crossing.

Finally, the Railroad argues that DOT must share in the costs to repair the Crossing because Fenton's assistant, Cooper, was on-site at the Crossing when the tracks were superelevated. Cooper failed to raise any concerns or objections to the work performed by the Railroad. Thus, the Railroad was prevented from mitigating any problems before the work was completed.

This argument is not compelling. It is clear from the testimony of Fenton that Cooper was not present throughout the entire reconstruction of the Crossing. There is no evidence to suggest Cooper was aware of the changes to the Crossing's grade or the superelevation of its tracks, and the ALJ credited Fenton's testimony that DOT was not aware of those changes until after the Crossing reopened to vehicular traffic. The current issues with the Crossing are the sole responsibility of the Railroad, which indisputably failed to mention or discuss the changes prior to completing them.

### IV.   Conclusion

Although DOT and the Railroad came to an agreement regarding the replacement of the Crossing and the roadway approaches, the Railroad made additional changes not contemplated in the Secretarial Letters or approved by the PUC. The Railroad has not disputed that it did not discuss its plans to alter the grade

11

and track elevation at the Crossing with DOT or the PUC prior to construction. These alterations created a step-like, and dangerous, transition from the roadway approaches through the Crossing that must be remediated through reconstruction of the Crossing. The Railroad has not denied the ongoing danger this transition presents to vehicular traffic.

Section 2702(a) of the Public Utility Code prohibits the alteration of a railroad crossing without PUC approval. Furthermore, Section 2702(c) of the Public Utility Code grants the PUC the authority to order a public utility to alter a railroad crossing. As the Railroad is the party solely responsible for creating the unsafe conditions at the Crossing, the PUC did not err in adopting the ALJ's recommendation that the Railroad be solely responsible for correcting those conditions.[4]

ELLEN CEISLER, Judge

---

[4] Given the apparent existing danger of the Crossing, we strongly urge the Railroad to commence reconstruction of the Crossing in an expeditious manner.

12

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading Blue Mountain & Northern  :
Railroad Company,                 :
        Petitioner        :
                       :
      v.               :  No. 486 C.D. 2023
                       :
Pennsylvania Public Utility       :
Commission,                       :
        Respondent        :

## **O R D E R**

AND NOW, this 4th day of June, 2024, the April 20, 2023 final order entered by the Pennsylvania Public Utility Commission (PUC) adopting the recommendation of an administrative law judge that Reading Blue Mountain & Northern Railroad Company should, at its sole cost and expense, reconstruct a public railroad crossing located at State Route 2019 in Pittston Township, Pennsylvania, is hereby AFFIRMED.

ELLEN CEISLER, Judge